IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PHILLIP W. P.,[1]

       Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

Case No. 17-cv-889-CJP[2]

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in November 2013, alleging disability as of December 21, 2011. After holding an evidentiary hearing, ALJ Lisa Leslie denied the application on August 11, 2016. (Tr. 11-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 22.

## Issue Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ erroneously found that plaintiff's course of treatment and daily living activities detracted from the credibility of his allegations, and failed to consider plaintiff's medications.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an

> alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Leslie followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity

since the alleged onset date and that he was insured for DIB through December 31, 2016. She found that plaintiff had severe impairments of lumbar radiculopathy, post-laminectomy syndrome, meralgia paresthetica, and obesity.[3]

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing and stooping; no kneeling, crouching, or crawling; and no work at unprotected heights or around moving mechanical parts or other such hazards. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff could not do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national and regional economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff.

1.  **Agency Forms**

Plaintiff was born in 1974 and was 37 years old on the alleged date of onset. (Tr. 191). He had a ninth grade education and had worked as a truck driver. (Tr. 194-195).

---

[3] "Meralgia paresthetica is a condition characterized by tingling, numbness and burning pain in your outer thigh. The cause of meralgia paresthetica is compression of the nerve that supplies sensation to the skin surface of your thigh." https://www.mayoclinic.org/diseases-conditions/meralgia-paresthetica/symptoms-causes/syc-20355635, visited on June 28, 2018.

In December 2013, plaintiff reported that he could not sit, stand, lie, or walk for a long period of time. He said he could not do anything without severe pain going through his back and down his right leg. He took Hydrocodone and Fentanyl, which caused dizziness. He cooked three or four times a week when his wife was at work, and sometimes picked his ten year old son up from school. He did dishes once in a while. He did no yardwork. (Tr. 227-234). In February 2014, he reported that his back was getting worse, he had "grinding" in his spine, and he was in a lot of pain. (Tr. 238).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in May 2016. (Tr. 43). Counsel stated that plaintiff hurt his back in an accident while driving a truck in December 2011; he had surgery in 2013, but continued to have problems. He had been diagnosed with post-laminectomy syndrome. (Tr. 46).

Plaintiff testified that he had not worked since December 21, 2011. He said he had a lot of pain in his back and his right leg. He could sit in a regular chair for 10 to 15 minutes and could stand for 10 to 15 minutes. He shifted positons back and forth. (Tr. 49-50).

Plaintiff's surgery made his problems worse. He had a lot more back pain and issues with his right leg that he did not have before. He had physical therapy and injections after the surgery. The injections did not give him any long term relief. He was taking morphine every 12 hours and Norco pain pills every 6 hours. The medications made him feel "really tired, like I'm high." He had been on a

Fentanyl patch, but was switched to morphine because it was stronger. (Tr. 50-51). His medication sometimes made him doze off. (Tr. 55).

On a typical day, plaintiff sat in a recliner with a heating pad until his medication got going. He took his son to school and spent most of the rest of the day in his recliner. He did not do laundry because the washer and dryer were downstairs and the steps were too much for him. He tried to run the vacuum, which took only 5 or 10 minutes. He used a cane when he had to do any amount of walking, like at a store. (Tr. 52-53).

His doctor talked about doing additional surgery which would involve putting in a cage. The doctor said he was not sure it would help, so plaintiff had "put it on hold." (Tr. 55).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work, but he could do other jobs such as telemarketer, sedentary cashier, and surveillance monitor. (Tr. 59-62).

### 3. Medical Records

In January 2012, an MRI of the lumbar spine showed degenerative disc change at L5-S1, degenerative disc change at L4-5 with central disc herniation, bilateral foraminal narrowing at L4-5, and degenerative facet joint changes at L5-S1. (Tr. 272-273). Plaintiff was treated with series of epidural steroid injections in March 2012 which provided relief only until the anesthetic wore off. He was referred to Dr. Todd Stewart for surgical evaluation. (Tr. 275-283).

Dr. Stewart, a neurosurgeon, performed surgery consisting of laminectomy, decompression, and fusion at L4-S1 in April 2013. (Tr. 339-340).

In June 2013, Dr. Stewart referred plaintiff to Dr. Barry Feinberg for evaluation and possible injection of the L4 nerve root. (Tr. 299). He had mid low back pain and pain down his right leg. Dr. Feinberg diagnosed post-laminectomy syndrome.[4] He administered an epidural injection. In July, he told Dr. Feinberg the relief lasted only until the anesthetic wore off. Dr. Feinberg administered a sacroiliac joint injection. (322-324).

In August 2013, plaintiff told Dr. Stewart he had only about 45 minutes of relief after the injections. He complained of increasing back pain and leg pain. (Tr. 307).

A CT scan in September 2013 showed no evidence of solid fusion. (Tr. 315).

In October 2013, Dr. Stewart noted that plaintiff still had low back and right leg pain. He had trouble tolerating Neurontin and Lyrica. He referred plaintiff for an EMG and noted that, if there were no signs of active denervation, he would not benefit from further surgery. Plaintiff said that he did "extremely well" with a TENS unit which distracted him from his pain and made it much more tolerable. (Tr. 291).

In November 2013, an EMG and nerve conduction study was done to investigate numbness and burning in plaintiff's right thigh. This showed meralgia

---

[4] Post-laminectomy syndrome is also called failed back surgery syndrome. See, http://neurosurgicalassociatespc.com/post-laminectomy-syndrome/, visited on June 29, 2018.

paresthetica rather than lumbar radiculopathy.   (Tr. 308-309).

Dr. Feinberg administered a right femoral nerve block in December 2013. (Tr. 348).   The next month, plaintiff told him his pain returned a few hours after the nerve block.   He had low back pain into the right leg.   He sat "left slump" and his gait was minimally antalgic.   He had some difficulty transferring from sitting to standing.   Straight leg raising gave him pain in the right thigh down to the knee. (Tr. 414-415).

In March 2014, plaintiff reported to Dr. Stewart that the he got only two hours of relief after the latest injection by Dr. Feinberg.   On exam, he had some 4+/5 weakness of the right quadriceps associated with pain, and increased sensitivity in the right lateral thigh.   Dr. Stewart noted that plaintiff had adjacent level disease at L3-4 with a broad-based disc bulge, and he may benefit from extension of the fusion up to L3-4.   (Tr. 437).

In January 2015, a CT study of the lumbar spine showed a fusion at L4-S1 "without obvious solid contiguous fusion."   There was multilevel stenosis most prominent at L3-4, "perhaps a little bit worse in comparison with 2013."   (Tr. 534-535).   In February 2015, Dr. Stewart noted that the etiology of plaintiff's right thigh pain was unclear. The EMG results were consistent with neuralgia paresthetica.   He also noted that there had been a progression of the stenosis at L3-4 and there was a "paucity of bone material in the posterior lateral recess from L4-S1."   He discussed with plaintiff the possibility of additional surgery to extend the fusion up to the L3 level, and putting more bone graft from L4-S1 to "buffer the

existing fusion." Dr. Stewart noted that "he may or may not get relief of his symptoms with this." (Tr. 526).

In June 2015, Dr. Stewart noted that plaintiff had been using a bone growth stimulator for about 3 months and had experienced burning in his legs and heat in his right leg. These symptoms had decreased since he stopped using the stimulator about a week prior. Dr. Stewart directed him to refrain from using the stimulator for 3 weeks and then to restart it. (Tr. 523).

Plaintiff last saw Dr. Stewart in August 2015. Dr. Stewart reviewed recent x-rays and remarked "There is not a robust fusion seen." He noted that plaintiff had symptoms in his posterior buttocks consistent with piriformis syndrome, symptoms of meralgia paresthetica, and ongoing issues with stenosis at L3-4 which may require additional surgery in the future. He had reached maximum medical improvement with his lumbar spine. (Tr. 520).

## Analysis

ALJ Leslie denied plaintiff's claim in August 2016. She did not cite SSR 16-3p, which supersedes the previous SSR on assessing a claimant's credibility. SSR 16-3p was republished in October 2017 and can be found at 2017 WL 5180304. SSR 16-3p became effective on March 28, 2016, and should be applied by the ALJ in any case decided on or after that date. 2017 WL 5180304, at *1.

SR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." *Ibid.*, at *2. "Adjudicators must limit their evaluation to the individual's statements about

his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Ibid*., at *11. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. In addition, the ALJ is required to explain the rationale for her conclusion: "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Ibid*., at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative

credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ is required to give "specific reasons" for her credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, the ALJ made the usual boilerplate statement that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 16). This statement is nonsensical: if plaintiff's impairments could reasonably be expected to cause the symptoms that he alleges, why does the ALJ doubt the accuracy of his claims? See, *Goins v. Colvin*, 764 F.3d 677, 681–82 (7th Cir. 2014), making the point regarding a very similar boilerplate statement.

The ALJ failed to give specific reasons supported by the evidence for doubting the veracity of plaintiff's claims.

The ALJ suggested that the medical evidence did not support his allegations.

She said, "Also persuasive is the claimant's level of treatment, which has been routine." (Tr. 18). The meaning of this statement is far from clear. It does not follow that "routine" treatment detracts from a claimant's allegations about ongoing symptoms. In any event, it is a stretch to call plaintiff's treatment routine. He had fusion surgery from L4 to S1 which has not been successful. He has been diagnosed with post-laminectomy syndrome, and the most recent CT study shows there is not "obvious solid contiguous fusion." Dr. Stewart, who did the surgery, acknowledges that there is not a "robust fusion."

Plaintiff is correct that the ALJ misconstrued some of the medical evidence. She said that "Despite his allegations that he got limited relief from treatment, the record suggests otherwise." (Tr. 18). She then cited to medical records which show, contrary to her suggestion, that injections and a nerve block relieved plaintiff's pain for only a short time, until the anesthetic wore off. She noted that plaintiff had only a "slight progression" of facet arthropathy and stenosis at L3-4. That the progression was "slight" does not detract from plaintiff's claims. The condition was serious enough that Dr. Stewart was willing to do another surgery to fuse that level as well. The ALJ concluded from plaintiff's refusal of additional surgery that his symptoms are not as serious as he claims, but, as he explained at the hearing, his doctor told him he was not sure it would help. That testimony is substantiated by Dr. Stewart's note from August 2015.

The ALJ also remarked that Dr. Stewart said plaintiff had reached maximum medical improvement with regard to his lumbar spine. Plaintiff injured his back

on the job and made a workers' compensation claim. Dr. Stewart sent copies of his office notes to the workers' compensation insurance carrier, Missouri Employer's Mutual. See, e.g., Tr. 520. The concept of "maximum medical improvement" is relevant to a workers' compensation claim and relates to an injured employee's entitlement to temporary total disability payments; that entitlement ends when the employee reaches maximum medical improvement, meaning the employee's condition has stabilized and is not expected to improve. See, e.g., *Westin Hotel v. Industrial Commission of Illinois*, 865 N.E.2d 342, 356 (Ill. App. 1st Dist. 2007). It does not mean, as the ALJ seems to think, that the patient has recovered or is symptom-free.

The ALJ's reference to plaintiff's daily activities does not support her conclusion either. She pointed out that plaintiff drove his son to school, vacuumed for a few minutes, sometimes went to the grocery store, prepared meals, occasionally did dishes, and occasionally walked outside. Although an ALJ should consider activities, this must be done with care. These meager and sporadic activities do not demonstrate that plaintiff was exaggerating his pain and they hardly suggest an ability to work fulltime. *Childress v. Colvin*, 845 F.3d 789, 792 (7th Cir. 2017); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

The ALJ failed to give good reasons grounded in the evidence for her decision not to credit plaintiff's allegations. This was error. *Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016)

The erroneous credibility determination requires remand. "An erroneous

credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: July 10, 2018.**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**